IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. 2:12-cr-21-WKW |
| | ) | |
| MARK L. HILL | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the court is Defendant Mark L. Hill's Motion to Dismiss as Time Barred, or, in the Alternative to Consolidate Counts One, Two and Three ("Motion to Dismiss") (Doc. 29) and Motion to Dismiss Indictment for Failure to Charge a Prosecutable Offense ("Motion to Dismiss Indictment") (Doc. 30).  The Government has filed Responses to the Motions (Docs. 42 & 43), to which Defendant filed Replies (Docs. 48 & 49).  For the reasons that follow, the undersigned Magistrate Judge RECOMMENDS that the Motions be DENIED.

**I.    DISCUSSION**

   **A.    *Statute of Limitations***

Defendant Hill is charged in Counts One through Three of the Indictment under the Major Fraud Act, the statute of limitations for which is seven years.  *See* 18 U.S.C. § 1031(f) ("A prosecution of an offense under this section may be commenced any time not later than 7 years after the offense is committed, plus any additional time otherwise allowed by law.").  The Major Fraud Act criminalizes "[w]hoever knowingly executes, or attempts to execute, any scheme or artifice . . . to defraud the United States . . . ." 18 U.S.C. § 1031.  Hill argues that the scheme with which he has been charged was "executed" more than seven years prior

to the indictment. Specifically, he argues that the execution and completion of the scheme occurred in 2003, (and therefore outside the seven year statute of limitations)[1] when "the Mentor-Protégé Agreement between Caddell and Mountain Chief was entered and approved by the Defense Department." Mot. (Doc. 29) at 6. The Government counters by arguing that the "individual payment requests were the 'executions' of Defendant Hill's fraud scheme, and the payment requests charged in Counts One through Three are well within the applicable seven-year statute of limitations." Resp. (Doc. 42) at 3.

> Defendant Hill accurately expresses the issue presented in his Motion as such:
>
> The statute of limitations issue in this case ultimately depends on whether the conduct Mr. Hill is charged with in Counts One through Three constitutes three separate executions of the alleged fraudulent scheme. If the three payment submissions which form the basis of Counts One, Two and Three constitute separate executions, then there is no statute of limitations problem, as each submission was made within seven years of the Indictment. On the other hand, if those payment submissions are merely steps or acts in furtherance of the overall fraudulent scheme, then Counts One through Three are barred by the statute of limitations, as the scheme was actually executed back in 2003.

Mot. (Doc. 29) at 6. The question for the court then, is what constitutes an "execution." As the parties' briefs illustrate, there are very few cases on this subject.[2] Hill's Motion and

---

[1] The Mentor-Protégé Agreement was entered and approved in 2003 and the indictment was filed January 19, 2012.

[2] Both parties agree that generally, the courts have looked to the bank fraud statute, 18 U.S.C. § 1344, for guidance on determining what constitutes an "execution." *United States v. Reitmeyer*, 356 F.3d 1313, 1318 (10th Cir. 2004) ("Although the Act criminalizes each knowing 'execution' or 'attempted execution' of a scheme, the Act does not define these terms. Nevertheless, case law interpreting the term 'execution' in the bank fraud context provides some guidance. In determining what constitutes an 'execution,' a court should first 'ascertain the contours of the scheme.'").

2

Reply are founded on his reading of the case law interpreting the statute and his arguments are based on comparing and contrasting the facts alleged in the indictment and the facts of other cases where the courts determined what constituted an execution in those particular schemes. This recommendation will focus on Hill's arguments by analyzing the cases set forth in his Motion.

Hill first points this court to the case of *United States v. Reitmeyer*, 356 F.3d 1313 (10th Cir. 2004). Hill accurately recites the facts of that case as follows:

> *Reitmeyer* involved a contract with the Army Corps of Engineers to construct a groundwater treatment facility. 356 F.3d at 1315. The contractor claimed that certain cost overruns had been encountered due to a variation between the geologic conditions set forth in the contract specifications and those actually encountered during the work. *Id*. at 1316. More than seven years before the indictment, the contractor submitted a certified claim for a nearly $4 million cost adjustment. *Id*. After the adjustment was submitted, and within the seven year statutory period, the defendants met with the government to promote and support their claimed adjustment. *Id*. On the basis that the cost adjustment claim was allegedly fraudulent, the indictment charged the defendants with executing or attempting to execute a scheme to defraud the government in violation of the Major Fraud Act. *Id*.

Mot. (Doc. 29) at 5. Hill focuses on the *Reitmeyer* court's finding "that the original submission of the equitable adjustment claim was the actionable execution because it was '[a]t this point the Companies' conduct first created a financial risk to the government and involved an obligation to be truthful.' *Id*. at 1318-1319." Mot. (Doc. 29) at 6. The *Reitmeyer* court rejected the government's argument that the defendant's actions in support of that original claim did not constitute new executions, but rather were acts in support of the scheme and "[e]ach act in furtherance of a scheme does not constitute a separate offense. .

3

. .ND" *Id*. at 1317.  However, the crux of the *Reitmeyer* holding runs counter to Hill's position.

The court in *Reitmeyer* determined that the later actions of the defendants in that case did not constitute separate executions, because "[o]nce the Companies filed their claim, they did not need to engage in any additional conduct to realize the ultimate goal of their scheme—the receipt of four million dollars from the government.  At this point the Companies' conduct first created a financial risk to the government and involved an obligation to be truthful." *Id*. at 1318-19.  Unlike *Reitmeyer*, where there was a single claim for a cost adjustment, each request for payment in this case was independent from the other. Each was a separate request for reimbursement for services and each "created a financial risk to the government and involved an obligation to be truthful."

Hill likens these multiple requests for payment to a fixed sum contract and evokes the decision in *United States* v. *Wiehl,* 904 F. Supp. 81 (N.D.N.Y. 1995) and the court's finding there, that each invoice submitted to the government under the contract "constituted a single execution of a scheme to defraud the government within the meaning of the major fraud statute." *Id*. at 91.  Hill argues that "[t]he same analysis is applicable here. While not disclosing this fact in the Indictment, the Mentor-Protege Agreement that Caddell had with Mountain Chief involved a fixed contract sum - $467,000.00."  Mot. (Doc. 29) at 8.

Hill's focus on the Mentor-Protégé Agreement as a fixed contract misses the mark. The Indictment sets forth the contours of the Mentor-Protégé Program as a Department of Defense Incentive program, whereby "the Defense Department reimbursed the mentor firm

4

for costs the mentor firm incurred providing developmental assistance to its protégé firm." Indictment (Doc. 1) at 2. Whether there was a fixed price contract between Caddell and Mountain Chief does not make the first submission for reimbursement to the government the completion of the scheme. Each submission for reimbursement was not dependent upon the other and not subject to a fixed price contract for goods or services[3] between the government and Caddell.

Importantly, while evaluating Hill's arguments here, the court is mindful that "[d]etermining what constitutes an 'execution' depends upon the particular facts of each case." *Wiehl*, 904 F. Supp. at 88. *See Reitmeyer*, 356 F.3d at 1318 ("[W]hether [conduct] is an 'execution' of the scheme or merely a component of the scheme will depend on several factors including the ultimate goal of the scheme, the nature of the scheme, the benefits intended, the interdependence of the acts, and the number of parties involved."). After "ascertain[ing] the contours of the scheme,"[4] the reason the court finds that each submission for payment in this case was an execution and, thus, a separate offense unlike the cases cited by Hill in support of his Motion, is that after the Mentor-Protégé Program was approved, Defendants had to engage in "additional conduct to realize the ultimate goal of their scheme—the receipt of [money] from the government." *Reitmeyer*, 356 F.3d. at 1319. That

---

[3] The facts of the *Wiehl* case, which set it apart from the present case, involved a fixed contract for the delivery of a certain amount of goods (Roller-bearings) to the government.

[4] "In determining what constitutes an 'execution,' a court should first ascertain the contours of the scheme." *Reitmeyer*, 356 F.3d at 1318 (internal quotation omitted)

5

is, Defendants submitted individual requests for reimbursement, and each request carried with it a new financial risk to the government and involved an obligation to be truthful. Each execution in this case was independent of the other and the three charged in Counts One through Three of the Indictment do not fall outside of the statute of limitations.

Hill also moves the court to consolidate the counts on the argument that they are multiplicitous. His argument is predicated on the above argument that only a single "execution" occurred here. Because the court rejects that argument, the court also finds that consolidation of counts One through Three is not proper.

### B.     *Prosecutable Offense*

Hill also moves to dismiss Counts One through Three of the Indictment pursuant to Rule 12(b)(3)(B). Hill argues that the Indictment fails to state an offense under the Major Fraud Statute and is thus insufficient.

"An indictment is sufficient if '[i]t (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense.'" *United States v. Walker*, 490 F.3d 1282, 1296 (11th Cir. 2007) (quoting *United States v. Woodruff*, 296 F.3d 1041, 1046 (11th Cir. 2002)). The sufficiency of the indictment is to be determined from its face, and if it "tracks the language of the relevant statute" and "provides a statement of facts and circumstances that give notice of the offense to the accused," it will be deemed sufficient. *Id.*

Hill bases this argument on his contention that "the allegations [in the Indictment] relating to the Mentor-Protégé Program ("MPP") indicate that an MPP agreement, to the extent there was one, though approved by the government, was not a contract between the government and Caddell, but one between Mountain Chief and Caddell." Mot. (Doc. 30) at 8. Hill argues that because there is no alleged contract between Caddell and the government, then the Indictment does not allege a scheme. Hill sets forth the relevant portion of the statute "[a]fter removing language that is extraneous to the charges here" as:

> (a)   Whoever knowingly executes, or attempts to execute, any scheme or artifice with the intent -
> (I)   to defraud the United States; or,
> (2)   to obtain money or property by means of false or fraudulent pretenses . . . , in . . . any procurement of property or services as a prime contractor with the United States . . . if the value of such . . . contract is $1,000,000 or more.

Mot. (Doc. 30) at 3. Hill also focuses on the "procurement of goods and services" and "$1,000,000 or more" portions of the statute, arguing that "the Indictment does not allege that the developmental assistance which was to be provided to Mountain Chief under the MPP involved the *procurement of property or services* in connection with the MPP, or any other, contract," nor does it allege "that the Mentor-Protege Agreement itself had a value of over $1,000,000." Mot. (Doc. 30) at 9-10.

A reading of the statute in full, without Hill's removal of language he considers "extraneous to the charges here," reveals the sufficiency of this Indictment. A fuller representation of the relevant portion of the statute reads:

7

> "or in any procurement of property or services as a prime contractor with the United States **or as a subcontractor or supplier on a contract in which there is a prime contract with the United States**, if the value of such grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, is $1,000,000."

18 U.S.C. § 1031(a)(2) (emphasis added). "From a straightforward reading of this statute, we conclude that regardless of its privity with the United States, any contractor or supplier involved with a prime contract with the United States who commits fraud with the requisite intent is guilty so long as the prime contract, a subcontract, a supply agreement, or any constituent part of such a contract is valued at $1 million or more." *United States v. Brooks*, 111 F.3d 365, 368-69 (4th Cir. 1997).

The Indictment describes the Mentor-Protégé Program agreement to have been made in connection with "the Fort Bragg Contracts," each of which had a value of "more than approximately $65 million." Indictment (Doc. 1) at 3-4. The Indictment goes on to allege that the submissions for payment were "submitted to the Defense Department seeking payments to Caddell under the Fort Bragg contracts." *Id*. at 4. Thus, the Indictment sufficiently sets forth the prime contract valued in excess of one million dollars and describes the services rendered in relation to the prime contract.

Hill also moves for dismissal on the basis that "the grand jury may have returned the indictment based on the time-barred [Indian-Incentive Program] allegations." Mot. (Doc. 30) at 11. Hill's concern is that the grand jury may have returned the indictment based on the "pass-through" activities of the Indian-Incentive Program and any "execution of the [Indian-

8

Incentive Program] that could have been alleged as a crime under the Major Fraud Act is time-barred." *Id.* at 12. The court does not read the Indictment that way. Rather, the Indictment sets forth a scheme to fraudulently obtain money and charges Hill with three executions of the scheme. Counts One through Three specifically set forth the dates of each execution and attributes the requests for reimbursement as being under the Mentor-Protégé Program. The court does not believe that the grand jury was confused by the scheme.[5]

Finally, Hill argues that the Indictment is insufficient because it requires "pure speculation" as to three of the major elements of the crime charged, "at least one element of the crime charged (that the prime contract involved have a value of $1,000,000) was not adequately set out even in the 'boilerplate' section, that, in and of itself should be a sufficient basis for dismissal . . ." and "in addition to that, the broader factual allegations simply do not support the elements of the crime charged." Mot. (Doc. 30) at 15-22. The court finds Hill's arguments here to be without merit.

The argument that the Indictment requires speculation is based on Hill's arguments set forth above relating to the prime contract, procurement of property or services, and the value of the contract. The court has rejected Hill's reading of the indictment as set forth above. Moreover, the Indictment presents the essential elements of the charged offenses and

---

[5] Hill's contention that the grand jury "could well have concluded that the prime contract need only be $1,000,000 if the Indictment were to be based on the fraud of the subcontractor and supplier," Mot. (Doc. 30) at 13, is undermined by the plain language of the Indictment, statute, and *Brooks*, 111 F.3d at 368-69. The prime contract was for in excess of one million dollars and the executions were made in connection with the prime contract.

9

gives ample notice of the charges against Hill.  This is not a case like the ones cited by Hill where an indictment was dismissed because "on its face, it failed to explain how the acts [of the defendant] allegedly committed were unlawful under the cited statute." *United States v. Bobo*, 2007 WL 962976, at *3 (N.D. Ga. Feb. 16, 2007).  Counts One through Three sufficiently identify the scheme, the prime contracts valued in excess of one million dollars, and each execution.

### III.  CONCLUSION

Accordingly, for the above stated reasons, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion to Dismiss as Time Barred, or, in the Alternative to Consolidate Counts One, Two and Three (Doc. 29) and Motion to Dismiss Indictment for Failure to Charge a Prosecutable Offense (Doc. 30) be DENIED.

Additionally, it is

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before February 12, 2013**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District

Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE this 29th day of January, 2013.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE