IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. 2:12cr21-WKW |
| | ) | |
| MARK L. HILL | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the court is Defendant Hill's Motion to Suppress (Doc. 32).  Defendant ("Hill"), seeks to suppress "all statements attributed to him obtained by Government agents on the evening of July 14 and the early morning of July 15, 2010, including all evidence derived therefrom."  Mot. (Doc. 32) at 1.

On September 19, 2012, the undersigned held an evidentiary hearing on the Motion.  Jeremy Sausto ("Agent Sausto"), Special Agent with the General Services Administration, Office of the Inspector General, and Genice Armstrong ("Agent Armstrong"), Special Agent with Defense Criminal Investigative Service, Pensacola, testified at the hearing.

Upon consideration of the Motion to Suppress, the testimony at the evidentiary hearing, and the briefs, the undersigned Magistrate Judge RECOMMENDS that the Motion to Suppress (Doc. 32) be DENIED.

## I.   FACTS

Based on the testimony at the hearing held on September 19, 2012, and to a preponderance of the evidence, the court finds the operative facts as follows:[1]

At the time of the July 14, 2010 interview Hill had been employed by Caddell Construction, Inc. ("Caddell") for approximately ten years.  At that time, he held the position of estimator, a position he held for approximately three years.  Caddell is a major commercial and industrial federal government construction contractor with headquarters in Montgomery, Alabama.

On the evening of July 14, 2010, Hill and his wife, Pamela, arrived home from dinner at approximately 7:00 p.m.  The Hills pulled into their garage.  Agent Sausto and Agent Armstrong pulled into the Hills' driveway in a rented vehicle and wearing business attire.  Upon exiting the garage, the Hills and the agents met in the driveway.  The agents introduced themselves and displayed their badges and credentials.  Agent Sausto asked if they could come inside and ask Hill some questions regarding his employer.  The Hills acquiesced and invited the agents into their home.

The Hills invited the agents to sit at their dining room table.  Mrs. Hill asked if she could sit in and take notes during the interview and the agents told her she could do so.  Mrs. Hill, along with both of the agents, took notes during the interview.  Agent Sausto began by asking some background questions.  Shortly thereafter, Agent Sausto began to

---

[1] The court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v.*

ask some questions about Caddell's relationship with Mountain Chief Management Services ("Mountain Chief").  Hill then stated that he needed to ask Agent Sausto to stop because Jerry Hughes ("Hughes") had told him that if someone came to him asking questions about Mountain Chief, he should contact Hughes right away.  Agent Sausto asked Hill whether Hughes was an attorney and Hill responded that he was not.  Hughes served as vice president of Caddell's legal department.  Agent Sausto informed Hill that Hughes was being interviewed by other federal agents that same night.  Hill continued to talk to the agents and did not contact Hughes that night.

Agent Sausto then began asking Hill open-ended questions regarding his job at Caddell and Caddell's relationship with Mountain Chief, and about a program called the Mentor-Protégé Program.  Approximately an hour into the interview, Agent Sausto showed Hill documents related to the investigation.  Specifically, he showed Hill a State Department of Labor wage report packet, which included a packet of timecards, as well as the Mentor-Protégé Program application and agreement between Caddell and Mountain Chief.  Agent Sausto showed Hill a document with Hill's signature on it that indicated Hill was vice president of Mountain Chief.  Earlier in the interview Hill had stated that he had never been vice president of Mountain Chief.  At that point, Hill told the agents, "I believe we are finished."  Agent Sausto told Hill that it was fine if he thought they were finished, but their investigation revealed that he had not been one hundred percent truthful during the interview.  Agent Sausto also stated that Jill Kanney,

_Twomey_, 404 U.S. 477, 489 (1972)).

who worked for and with Hill, had already testified before the grand jury; that other individuals were simultaneously being interviewed, including Jerry Hughes; and that this was Hill's chance to tell his side of the story. At that point, Hill asked if he could confer with his wife in private. The Hills got up and went into a back bedroom where they remained for approximately twenty minutes.

Upon returning to the dining room, Hill stated that he had not been truthful but that he was going to be honest with the agents now and was willing to cooperate and continue answering questions. Agent Sausto asked Hill if he would be willing to do a consensually recorded telephone call with Hughes. Agent Sausto provided Hill with a standard form for a consensually recorded telephone call and asked Hill to review it. Agent Sausto asked the Hills if he could borrow some new batteries to use with his recording device. Mrs. Hill got up from the table to look for some batteries, but she could not find any. Mrs. Hill left the house for a few minutes in order to borrow batteries from her neighbor. Agent Sausto then decided not to conduct the recorded telephone call. Agent Sausto resumed the interview and asked Hill to start at the beginning. Mrs. Hill did not take notes during this part of the interview. Hill provided a statement. Agent Sausto wrote out Hill's statement, verbatim, and read it back to Hill. Agent Sausto made changes to the statement as directed by Hill and Hill initialed those changes. Hill then initialed the bottom of every page of the statement and signed and dated the document. Sometime after signing the statement, Hill directed Agent Sausto to add an additional paragraph to the end of the statement. The agents then left the Hills' home.

## II.    DEFENDANT'S CLAIMS

Hill presents the following issues in his Motion to Suppress:  1) whether Hill's "confession" is due to be suppressed because it was involuntarily given; and 2) whether Hill's "confession" must be suppressed because he was in *Miranda* custody yet not provided *Miranda* warnings.  Mot. (Doc. 32) at 5 & 17.  The court will address each of these issues in the section that follows.  Because the determination of whether or not Hill was in *Miranda* custody at the time of the interview in question is interrelated to Hill's claims and subclaims, the court will address that question first.

## III.   DISCUSSION

### A.    Whether Hill was in custody.

It is undisputed that the agents did not arrest Hill or read him his *Miranda* rights before or during the July 14, 2010 interview at issue.  Hill contends that his "alleged 'confession' must be suppressed because he was in *Miranda* custody yet not provided the Constitutionally-required *Miranda* warnings."  Mot. (Doc. 32) at 17.  In support of his custody argument, Hill points the court to the following factors:  "(1) the location of the questioning; (2) its duration; (3) statements made during the interview; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the end of the questioning."  *Id.* at 19.

The entitlement to *Miranda* warnings attaches only "when custodial interrogation begins." *United States v. Acosta,* 363 F.3d 1141, 1148 (11th Cir. 2004).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint

on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown,* 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983); *see also United States v. McDowell,* 250 F.3d 1354, 1362 (11th Cir. 2001) (Whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." (quotation marks and alterations omitted)).   "The test is objective:   the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting *Moya*, 74 F.3d at 1119).   The court must make a determination based on the "totality of the circumstances," and must consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'"  *Id.* (citing *Brown,* 441 F.3d at 1347, 1349 and quoting *United States v. Long,* 866 F.2d 402, 405 (11th Cir. 1989)).   The defendant bears the burden of establishing he was in custody and that his statements were made in response to government questioning.  *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden

of proving that the defendant voluntarily waived his privilege against self-incrimination.").

### 1. Location and lack of physical restraints

Hill argues that "although interrogated in the familiar setting of his home, the Agents (particularly Agent Sausto) so dominated the environment that this factor ultimately should not weigh against a finding of custody. . . . The confrontational and threatening approach taken by Agent Sausto had the effect of converting the familiar setting of the investigation into a coercive, law enforcement dominated environment." Mot. (Doc. 32) at 20.  The court disagrees.

While it is not dispositive, the fact that the interview took place in Hill's home weighs in favor of a non-custodial finding.  "[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  *Brown,* 441 F.3d at 1348.  Despite Hill's assertion to the contrary, the court finds no evidence of police domination of the environment.  Agents Sausto and Armstrong contacted Hill at his home.  The agents arrived in an unmarked rental car.  Both agents wore plainclothes business attire.  The agents were armed, but their weapons were concealed by clothing and were never drawn or displayed.  The agents asked to speak with Hill, giving him the chance to decline.  Hill invited the agents into his house, agreed to speak with them, and took them into the dining room, which was an open area in his home.  The agents did not restrain Hill in any way and at no point did the agents prevent him from moving about his home or ask that

he remain in their line of sight.  Indeed, Hill freely moved about his home—getting a glass of water for himself and for Agent Armstrong and even going into a back bedroom where he had a private conversation with his wife.  The agents did not direct his movements in any way.  They did not separate him from his wife, who could provide support and comfort.  Indeed, Mrs. Hill was present during the entire interview, took notes, and was able to confer with him in private for approximately twenty minutes.  *See, e.g.*, *United States v. Mottl,* 946 F.2d 1366, 1370-71 (8th Cir. 1991) (holding defendant not in custody, *inter alia,* because agents did not dominate the atmosphere or remove family members who might have lent moral support).  Moreover, there is no evidence of physical contact or control of Hill by the agents.  At no point did the agents display their weapons or handcuff Hill.  The agents did not touch Hill or his wife, whether by search, pat down or other physical action denoting compulsion or authority nor did they threaten any physical force.  *See, e.g., United States v. Mittel–Carey,* 493 F.3d 36, 40 (1st Cir. 2007) ("[T]he element that carries the most weight is the level of physical control that the agents exercised over the defendant during the search and interrogation.").

Hill's argument that "the Agents did physically restrain [his] ability to leave by parking behind his vehicle when they pulled into the driveway," Mot. (Doc. 32) at 26, falls short of the kind of restraint courts have found sufficient to constitute custody.  Hill points to *Sprosty v. Buchler*, 79 F.3d 635 (7th Cir. 1996) for support.  That case is readily distinguishable because in that case the police "surrounded Sprosty's car, blocked the driveway from his car to the street, and escorted him inside" and, while "[f]our of the

officers searched for the photographs," another "who was armed and in uniform, remained with Sprosty to guard him." *Sprosty*, 79 F.3d at 642. Moreover, as the Government points out, "both Defendant Hill and his wife had the ability to leave the interview, which they demonstrated by in fact leaving the interview. Defendant Hill left the interviewing agents during his twenty-minute conversation with his wife and Mrs. Hill left the house altogether when she went to borrow batteries from a neighbor for Agent Sausto's recording device. Defendant Hill also went into [the] kitchen at least once during the interview." Gov.'s Resp. (Doc. 45) at 15. Hill could have ended the interview after this break, yet, upon his return to the dining room, he indicated he wished to continue to talk with the agents. Accordingly, this factor weighs against a finding of custody.

### 2.    Statements made during the interview

Hill contends "the Agents never told [him] that he was not under arrest, that the interrogation was voluntary or that he could refuse to answer their questions. They also never informed him that he was free to leave." Mot. (Doc. 32) at 23. Hill also contends that Agent Sausto threatened to return with a subpoena if he refused to talk to them. As to the subpoena, Hill has not provided any evidence that Agent Sausto ever threatened to return with a subpoena and Agent Sausto testified to the contrary. Moreover, as discussed above, the agents asked Hill if they could ask him some questions about Caddell and he said yes and invited them into his home. He could have simply declined to answer any questions.

9

As to Hill's argument that the agents did not explicitly state that he was not under arrest, it is undisputed that the agents never told Hill he *was* under arrest.  Moreover, they did not do anything to suggest to Hill that he was under arrest and this factor weighs against a finding of custody. *See generally Yarborough,* 541 U.S. at 664 (fact that police did not threaten the defendant or suggest he would be placed under arrest weighed against a finding of custody); *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (suspect not in custody because "he was never placed under arrest or told that he was under arrest").  A reasonable innocent person in Hill's position would have felt that he was at liberty to terminate the interrogation and leave, as he in fact did so in this case, when he left the dining room to confer with his wife.

Next, Hill contends that "[e]arly in the interrogation, [he] requested to speak with the Caddell legal director, yet the agents did not allow him to do so.  Later, Mark Hill expressly stated that he was stopping the interrogation, but instead of honoring his request, Agent Sausto responded with accusations and threats."  Mot. (Doc. 32) at 24. First, as discussed *infra*, Hill asked to speak to Jerry Hughes, who is not an attorney. Moreover, while Hill may have sought to terminate the interview when he told the agents, "I believe we are finished," he then stated he wished to continue answering questions when he returned to the dining room after conferring with his wife and told the agents he had not been truthful but would be truthful from then on.  Hill presented no evidence at the hearing to establish that his statement to the agents "I believe we are finished" was an explicit termination of the interview.  The fact that Agent Sausto told Hill he did not

believe he was being truthful after Hill said he believed he was finished, does not render Hill's statements involuntary.  *See, e.g.*, *United States v. Leese,* 176 F.3d 740, 744 (3d Cir. 1999) (finding postal employee was not in custody during questioning even though postal inspectors confronted her with discrepancies in her accounts, asked her point blank questions as to whether she committed the crime, challenged her answers, and attempted to discover details of the crime because there was no evidence to suggest that the inspectors would not have departed on request or allowed the postal employee to do so).  Thus, in this case, "[a] reasonable person would not have understood Agent [Sausto's] remarks to have restricted his or her ability to terminate the questioning." *United States v. Hampton*, 2012 WL 1354579, at *14 (N.D. Ga. Mar. 5, 2012).

Perhaps more important than the statements Hill made are the words Hill never uttered.  Hill never asked to speak to his attorney, he never asked to leave the premises, and he never asked the agents to leave his home.

Finally, Hill argues that the fact that he was confronted with evidence of guilt is a factor that weighs in favor of custody.  The court agrees.  However, as the Government points out, "this factor alone—when contrasted with the factors that indicate Defendant Hill was *not* in custody—does not justify a finding of custody."  Gov.'s Resp. (Doc. 45) at 18.

### 3.    Duration of the Interview and release at the end of the questioning

Finally, the fact that Hill was not arrested at the conclusion of the interview and the agents promptly left his home at the conclusion of the interview is a factor that

weighs against a finding of custody.  However, the court does find that the length of the interview weighs in favor of custody as the interview lasted over five hours.

Upon review of the record, and upon considering the totality of the circumstances in this case, the court finds Hill has not met his burden of establishing that he was restrained to a degree associated with formal arrest for purposes of *Miranda*.  The following facts lend some support to Hill's argument that *Miranda*'s custody requirement was met:  the interview lasted over five hours; Hill did not initiate the interview, and he was not explicitly advised that he was not under arrest and was free to decline to speak with the agents; and he was confronted with evidence of guilt.  These circumstances, however, as discussed above, were greatly outweighed by the other factors.

### B.    Whether the confession was voluntary.

"[A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence."  *Bram v. United States*, 168 U.S. 532, 542-43 (1897).  The United States Court of Appeals for the Eleventh Circuit focuses the "voluntariness inquiry on whether the defendant was coerced by the government into making the statement:  The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception."  *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005) (citing *United States v. Mendoza-Cecelia,* 963 F.2d 1467, 1475 (11th Cir. 1992) and quoting *Colorado v. Connelly,* 479 U.S. 157, 170 (1986)

(internal quotations omitted)).  The court must focus its voluntariness inquiry on whether there has been police overreaching.  *United States v. Bernal-Benitez,* 594 F.3d 1303, 1319 (11th Cir. 2010).  In making its determination, "'[t]he district court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession.'"  *Thompson*, 422 F.3d at 1295 (quoting *Mendoza-Cecelia,* 963 F.2d at 1475 (11th Cir. 1992)).  "Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment," and "[a]bsent any evidence of psychological or physical coercion on the part of the agents, there is no basis for declaring [a defendant's] statements [ . . . ] involuntary."  *Id.* at 1296 (quoting *United States v. Barbour,* 70 F.3d 580, 585 (11th Cir. 1995).[2]  The Government bears the burden of establishing that Hill's statements were voluntary by a preponderance of the evidence.  *Connelly*, 479 U.S. at 168; *Lego v. Twomey,* 404 U.S. 477, 489 (1972).

Hill argues that "[t]he 'totality of the circumstances' demonstrates that [his] alleged 'confession' was coerced."  Mot. (Doc. 32) at 8.  Hill points to five facts in this case in support for his coercion argument and the court discusses each fact below.  And while the court will review each factor individually, the court is mindful that the test is one of the totality of the circumstances.

---

[2] *See also United States v. Boskic,* 545 F.3d 69, 78 (1st Cir. 2008) ("[A]fter *Connelly,* 'only confessions procured by *coercive official tactics* should be excluded as involuntary.'") (quoting *United States v. Byram,* 145 F.3d 405, 407 (1st Cir. 1998)).

1.    **Whether Hill invoked his right to counsel and right to remain silent.**

        a.    **Invocation of the right to counsel**

Hill argues that Agent Sausto deceived him and refused to honor his invocation of his right to counsel and his right to remain silent.  Hill contends "[a]t the very beginning of the interrogation, Mr. Hill stopped Agent Sausto and requested that he be allowed to contact Caddell's legal department for assistance.  Agent Sausto did not honor Mr. Hill's invocation of his right to counsel but instead convinced Mr. Hill he did not need an attorney and would be better off by talking to the Agents and answering their questions.  Sausto's statements were deceptive because they conveyed to Mr. Hill that he did not have a right to have counsel present."  Mot. (Doc. 32) at 9.

Specifically, Hill argues he invoked his right to counsel when he told the agents that Jerry Hughes had asked him to call him if anyone came asking any questions about Mountain Chief.  Mot. (Doc. 32) at 9.  The Government argues that "[t]he right to counsel attaches only when the subject of an interview **requests counsel**."  Gov.'s Resp. (Doc. 45) at 7 (emphasis in original).  The Government points out that "Hughes was not an attorney, and Defendant Hill knew—and confirmed repeatedly to the interviewing agents—this fact.  Defendant Hill therefore did not invoke his right to counsel when he asked to speak to Jerry Hughes." *Id.* at 8.

The *Miranda* right to counsel only attaches when an individual invokes the right during a custodial interrogation by making a clear and unequivocal request for counsel. *See Davis v. United States,* 512 U.S. 452, 461-62 (1994) ("If the suspect's statement is

not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him."). First, Hill was not in custody during the interview in question. *See* discussion *supra*. Second, Hill did not make a clear and unequivocal request for counsel. Hill asked to speak to Jerry Hughes, who, while holding the title of vice president of Caddell's legal department, was not an attorney. When Hill stated that he was told to contact Hughes if someone asked questions about Mountain Chief, the agents asked Hill whether Hughes was an attorney and Hill stated that he was not. Thus, Hill failed to make a clear and unequivocal request for counsel.

### b.    Right to remain silent

Next, Hill contends that he invoked his right to remain silent about an hour into the interview when he told the agents "I believe we are finished." Mot. (Doc. 32) at 10. Hill argues that "Agent Sausto refused to honor [his] clear and unambiguous invocation of his right to remain silent" and instead deceived Hill by telling him "the best thing for him was to tell them what really happened." *Id*. Hill argues that "Sausto's comments were deceptive because they were interpreted by [him] to mean that it would be better for him to say something—contrary to his right to remain silent." *Id*.[3] Hill argues that "but for Agent Sausto's coercive deception, [he] would have contacted counsel and remained silent. Mr. Hill's decision to continue the interview and 'confess' without counsel was

---

[3] Hill also contends that the agents said they would return with a subpoena if he would not agree to speak with them voluntarily. At the suppression hearing, Agent Sausto and Agent Armstrong both testified that they never stated they would return with a subpoena. *See* Tr. 12; 212. Hill did not testify at the hearing and the court found the agents' testimony to be credible.

therefore the product of Agent Sausto's deceptive statements, not the free and unconstrained choice of Mr. Hill." *Id.* at 12.

First, as discussed *supra*, the interview in question was a voluntary interaction between Hill and the agents.  Second, Hill did not make an unequivocal invocation of his right to remain silent.  As with the invocation of the right to counsel, an invocation of the right to remain silent must be unequivocal.  About an hour into the interview, Hill did in fact tell the agents "I believe we are finished."  Agent Sausto then told Hill that it was fine if he thought they were finished but that their investigation had revealed that he had not been one hundred percent truthful with them.[4]  At that point, Hill asked to confer with

_____

[4] At the suppression hearing, Agent Sausto testified as follows:

> A.   About an hour into the interview, I showed him the State Department of Labor for Alabama's wage report packet. . . .  And located in that packet was also Mark Hill's name and signature stating that he was the vice president for Mountain Chief Management Services. . . . I showed it to Mark Hill and I said, Is this your signature, after asking him if he was ever the vice president of Mountain Chief.  And he responded that he was not, earlier in the interview.  I slid this over to him and he said, I think we're finished.
>
> Q.   Okay.  What did you say in response?
>
> A.   I said, That's fine if you think you're finished, but our investigation proves you've not been a hundred percent truthful with us here today.
>
> Q.   All right.  Did you say anything else to him?
>
> A.   Yes.  I also said that we've been working this investigation for some time and we know many of the details concerning it.  I said that Jill Kanney who worked for and with Mark Hill was already – had already testified in front of the grand jury.  I said that other individuals of Caddell were being simultaneously interviewed, to include Jerry Hughes.  And I said that this was his chance to basically tell us his side of the story.  I told him there was a potential that Caddell could, you know, make him look as the fall guy in this particular investigation.
>
> Q.   What was Mr. Hill's reaction to all this?

his wife in private—a request the agents granted.   Hill conferred with this wife for approximately twenty minutes.  He did not ask the agents to leave.  Upon returning to the dining room, Hill stated that he was ready to cooperate and tell them the truth.  Hill could have refused to continue to answer any questions, but he did not do so.  Indeed, as both Hill and the Government point out, in *Martin v. Wainwright*, 770 F.2d 918, 927 (11th Cir. 1985), the United States Court of Appeals for the Eleventh Circuit has found it "significant" when the defendant "never explicitly refused to answer any more questions."  *See* Mot. (Doc. 32) at 10 n.5; Gov.'s Resp. (Doc. 45) at 9.

Third, Hill's argument that Agent Sausto deceived him by telling him that "the best thing for him was to tell them what really happened," Mot. (Doc 32) at 10, is unpersuasive.   Under the circumstances, Agent Sausto's remark is insufficient to invalidate the voluntariness of Hill's statements, which were made after he indicated he would be truthful and would continue to answer questions.  Courts have held that isolated incidents of police deception[5] and discussions of realistic penalties for cooperative and

---

A.      There was kind of a pause, and then after the pause, he and his wife
        looked at each other, and then he asked, Can I discuss this situation with
        my wife? And we said, Sure, you're free to do what you want.

Tr. 22-24.  At that point, the Hills went into a back bedroom, closed the door and remained there for approximately twenty minutes.

[5] *See United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984) (finding that that the police's use of a trick alone will not render a confession involuntary and noting that cases involving police trickery where a confession has been held involuntary there have been other aggravating circumstances as well).

17

non-cooperative defendants,[6] are normally insufficient to preclude free choice.  Hill also argues that "Agent Sausto coerced [his] 'confession' by deceiving him about the legal impact of his signing time sheets in connection with the MPP."  *Id.* at 11.  To the extent Hill argues Agent Sausto misrepresented the felony charges associated with falsifying timesheets, this alleged misrepresentation would not render Hill's statements involuntary.[7]  Hill offered no evidence that "but for Agent Sausto's coercive deception, [he] would have contacted counsel and remained silent."  Mot. (Doc. 32) at 12.  Indeed, the only evidence presented at the hearing showed a voluntary interaction between the agents and Hill and his willingness to cooperate.

### 2.    Whether the agents made promises of leniency to Hill.

Hill argues that "he interpreted Agent Sausto's responses to the invocation of his right to counsel and his right to remain silent – that continuing to answer questions would be beneficial to [him] – as implied promises of leniency."  Mot. (Doc. 32) at 13.

"The test is whether [Hill's] 'will [was] overborne and his capacity for self-determination critically impaired.'"  *Martin v. Wainwright*, 770 F.2d 918, 926 (11th Cir.

---

[6] *See United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) ("'[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government.'" (quoting *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978))).

[7] *See, e.g.*, *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (finding fact that during interrogation police misrepresented statements and falsely told defendant that his companion had confessed, while relevant, was insufficient to make defendant's otherwise voluntary confession inadmissible); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 495 (9th Cir. 1997) ("Misrepresentations linking a suspect to a crime or statements which inflate the extent of evidence against a suspect do not necessarily render a confession involuntary.").

1985) (quoting *Culombe*, 367 U.S. at 602).   The court finds that Agent Sausto's comments to Hill regarding cooperation were not misleading and did not unduly overbear Hill's will.   *See, e.g.*, *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) ("A statement made by a law enforcement agent to an accused that the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary."); *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) ("Encouraging [the defendant] to tell the truth also did not amount to coercion.").

Most importantly, the uncontroverted evidence presented at the hearing was that Agent Sausto never made any promises of leniency to Hill.   Tr. 40-41.   Having considered the evidence and the totality of the circumstances, including all reasonable inferences therefrom, the court credits Agent's Sausto's account and does not find that Agent Sausto made some promise of leniency associated with Hill's statement.

### 3.      Hill was not read *Miranda* rights.

Hill argues that "[f]ailing to provide [him] with his *Miranda* rights is yet another coercive aspect of this interrogation which weighs against a finding that [his] confession was voluntary."   Mot. (Doc. 32) at 14-15.   However, as the court discussed *supra*, Hill was not in custody for the purposes of *Miranda* warnings.   The entitlement to *Miranda* warnings attaches only "when custodial interrogation begins."   *Acosta,* 363 F.3d at 1148.

### 4.      Length of the interview

---

19

The Government concedes that this was a lengthy interview and the court finds that the length of the interview weighs against a finding of voluntariness. However, this finding alone is not dispositive of whether or not Hill's statements to the agents were voluntary.

### 5.   Defendant's attributes

Hill points to the following attributes as characteristics supporting his motion to suppress:  1) that he "had never been interviewed by law enforcement" and "had never been involved in any way in a law enforcement investigation"; and 2) his mental state given that his father-in-law was recently diagnosed with bladder cancer and he was presented with evidence of wrongdoing by Agent Sausto. Mot. (Doc. 32) at 16-17.

Hill argues that his lack of experience with law enforcement weighs against a finding of voluntariness. While an individual's familiarity with the criminal justice system is one factor that a court may consider in analyzing the voluntariness of the suspect's statements, *see Moran v. Burbine,* 475 U.S. 412, 421 (1986), it is not dispositive. *See, e.g., United States v. Amano*, 229 F.3d 801, 805 (9th Cir. 2000) (finding a defendant's waiver of his *Miranda* rights to have been voluntary in the circumstances of that case, despite his "previous lack of contact with the criminal justice system in the United States, and his lack of contact with the Japanese consulate").

The court finds Hill's argument regarding his mental state at the time of the interview to be unpersuasive. While the United States Supreme Court has held that one of the factors taken into account is the defendant's mental capacity, *see, e.g., Fikes v.*

*State of Ala.,* 352 U.S. 191 (1957) (less than third grade education); *Culombe v. Connecticut,* 367 U.S. 568 (1961) (defendant was mentally defective), the Court has also held that this factor is "relevant only in establishing a setting in which actual coercion might have been exerted to overcome the will of the suspect." *Procunier v. Atchley,* 400 U.S. 446, 453-54 (1971). Absent actual coercion, even a person with mental disorders or a low IQ can be found to have confessed voluntarily.[8] Hill appears to argue he was in a diminished mental state given the news regarding his father-in-law's health and the fact that he was confronted with evidence of guilt. However, the United States Court of Appeals for the Eleventh Circuit has held that "mere emotionalism, confusion, or depression do not dictate a finding of mental incompetency or insanity." *United States v. Rouco*, 765 F.2d 983, 993 (11th Cir. 1985) (finding inculpatory statements made to the police following arrest to be voluntary (citing *Sullivan v. Alabama,* 666 F.2d 478, 482-83 (11th Cir. 1982) (holding that pre-*Miranda* statements to law enforcement to be voluntary and not the product of coercion because while the petitioner was described as "upset, depressed and confused," no medical evidence of insanity was presented during trial or

---

[8] *See, e.g.*, *Colorado v. Connelly,* 479 U.S. 157, 164 (1986) ("Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' ") (citation omitted); *United States v. Barbour,* 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary; there must be coercion by an official actor." (citing *Colorado v. Connelly,* 479 U.S. at 169-70)); *Moore v. Dugger,* 856 F.2d 129, 132 (11th Cir. 1988) (mental deficiencies, in the absence of police coercion, are not sufficient to establish involuntariness; the fact that defendant was generally calm and responsive during the interrogation, that he did not appear confused, and

on petition for habeas corpus and the sergeant who questioned petitioner "testified that he was very excited and disturbed, but, nevertheless, was coherent and responsive to questions.")). Being confronted with evidence of guilt also does not dictate a finding of involuntariness. *See, e.g.*, *Devier v. Zant*, 3 F.3d 1445, 1459 (11th Cir. 1993) ("The mere fact that [the defendant] was uncomfortable or agitated while under the close scrutiny of the police does not render their conduct unconstitutionally coercive."); *Rouco*, 765 F.2d at 993 ("Some amount of nervousness and depression following one's arrest for murder, where the evidence of guilt is overwhelming, is normal and not grounds for holding an otherwise valid confession inadmissible."). Moreover, there is no evidence to suggest Hill was in any form of mental distress during the interview. After meeting with his wife, Hill continued the interview and proceeded to give a statement, reviewing it and making changes and even adding to the statement after he had signed it. While it was in fact a lengthy interview and it was late into the early morning, Hill never presented signs of exhaustion. He maintained his composure and conducted himself rationally. More importantly, Hill never showed signs that he did not understand the circumstances of what was happening. Indeed, the fact that he asked to confer with his wife in private demonstrates he understood the gravity of the situation.

Hill's personal characteristics support a finding that his statements were voluntary. Whether he had prior experience with law enforcement, at the time of the interview, he was an educated adult holding a high level position in a major construction company.

---

that he understood the questions put to him established a valid waiver of *Miranda* rights, despite

Additionally, the record does not indicate that he suffered from any physical or mental conditions which would impair his ability to fully participate in the interrogation. Overall, these characteristics paint the picture of mature adult with significant professional and personal responsibilities. While Hill asserts in his motion that his father-in-law's recent bladder cancer diagnosis and having been confronted with evidence of guilt had a taxing effect on his emotional state that night, he offered no evidence in support of those assertions. Rather, the evidence presented showed that Hill was of sound mind at the time of the interrogation.

Accordingly, upon consideration of the totality of the circumstances, and for the reasons stated above, and the court finds there is no evidence that Hill's will was overborne when he made the statements at issue. Thus, the Government has established that Hill's statements were voluntary.

## IV.    CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion to Suppress (Doc. 32) be DENIED.

It is further

ORDERED that on or before **March 8, 2013**, the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised

---

defendant's low IQ).

that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Sec., Inc*., 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 22nd day of February, 2013.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE